RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0440p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

ALFRED MORALES,

*Petitioner-Appellee/
Cross-Appellant,*

Nos. 00-3694/3787

*v.*

BETTY MITCHELL, Warden,

*Respondent-Appellant/
Cross-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio
at Cleveland and Youngstown.
No. 95-02674—Peter C. Economus, District Judge.

Argued: April 24, 2007

Decided and Filed: November 2, 2007

Before: SUHRHEINRICH, MOORE, and CLAY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Michael L. Collyer, OFFICE OF THE ATTORNEY GENERAL, Cleveland, Ohio, for Appellant. Laurence E. Komp, ATTORNEY AT LAW, Manchester, Missouri, for Appellee. **ON BRIEF:** Michael L. Collyer, Daniel R. Ranke, OFFICE OF THE ATTORNEY GENERAL, Cleveland, Ohio, for Appellant. Laurence E. Komp, ATTORNEY AT LAW, Manchester, Missouri, Amanda Martinsek, VORYS, SATER, SEYMOUR & PEASE, Cleveland, Ohio, for Appellee.

MOORE, J., delivered the opinion of the court, in which CLAY, J., joined. SUHRHEINRICH, J. (pp. 24-32), delivered a separate dissenting opinion.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge. Petitioner-Appellee/Cross-Appellant Alfred Morales ("Morales") was convicted of kidnapping and aggravated murder in an Ohio state court and sentenced to death. He petitioned the district court for a writ of habeas corpus, arguing, inter alia, that his trial counsel was constitutionally ineffective and that the trial court erroneously struck a potential juror from the panel. The district court granted the petition, in part, vacating Morales's death sentence on the ground that his trial attorney had rendered ineffective assistance of counsel

("IAC") at the penalty phase of the trial. Respondent-Appellant/Cross-Appellee Betty Mitchell ("Mitchell" or "the state") now appeals the district court's issuance of the writ. Morales cross-appeals the district court's denial, in part, of his petition on the grounds that his counsel was not ineffective at the guilt phase of the trial and that the trial court did not err in striking a juror that it found was not death-qualified and lacked an adequate understanding of the proceedings. For the reasons set forth below, we **AFFIRM** the district court's partial grant of the petition and issuance of the writ.

# I. BACKGROUND

## A. Factual Background

The undisputed facts underlying Morales's conviction were set forth by the Ohio Supreme Court as follows:

> Appellant, Alfred J. Morales, stands five feet, eight inches tall, weighs two hundred twenty pounds, and is an expert in the martial arts. The Trevino family, Mario being the youngest male member, had known appellant for many years prior to the evening of March 2, 1985. Through their acquaintanceship with appellant, the Trevinos were well aware of appellant's skill in the martial arts and of his ability to use a variety of weapons for their intended purposes.
>
> For a time, Jesse Trevino, the victim's older brother, and appellant had been friends. This friendship ended at a previous time when Jesse refused to commit perjury for appellant, thereby depriving appellant of an alibi regarding the theft of a taxicab. As a result of Jesse's refusal, appellant pled guilty to the theft offense and was returned to the Mansfield Reformatory.
>
> While in the Mansfield Reformatory, appellant wrote threatening letters to Toby Trevino, brother of both Jesse and Mario. The letters suggested revenge upon the whole Trevino family, including Yolanda Trevino, sister of Jesse, Toby and Mario, who had previously refused to become appellant's girlfriend. The envelope of one letter contained both a drawing and the letters "D.W.C.S.," "B.W." and "D.O.D." The letters were later shown to mean "Death Will Come Soon," "Beware" and "Demon of Darkness," a name appellant used for himself. The drawing on this envelope depicts a heart pierced by a sword. Toby Trevino's name is printed on the heart and blood is dripping from the tip of the sword. The envelope of the second letter likewise contained a drawing. The second drawing depicts a skull, dripping blood, with a sword passing through it. Beneath the skull is printed the word "DANGER."
>
> On February 19, 1985, appellant was released from the Mansfield Reformatory. During the three-week period between appellant's release and Mario's murder, appellant was observed watching the Trevino home while hiding in the bushes of a house near the Trevinos' residence. During this same time period, appellant stated to a variety of witnesses that he was "going to kill Toby's ass," that "he had some killing to do and that he knew he was going back to where he came from," and that "he had a killing to do, and that he knew he was going back and he didn't care."
>
> On the evening of his death, Mario left home some time after 6:00 p.m. to play video games at a nearby store. After leaving the store, Mario was confronted by appellant who told Mario that he wanted to talk with him regarding the problems between appellant and the Trevino family. Mario accompanied appellant from the store to a secretive location, approximately one and one-half to two miles from the store. It was at this location that appellant murdered Mario.

Following the murder, appellant went to the nearby home of an acquaintance to wash the blood from his hands and apply ice to his knuckles to control the swelling. When appellant left that location, he left behind the towel containing the ice for his knuckles and his blood-stained white shirt. Soon after appellant's departure, the towel and blood-stained shirt were turned over to the authorities.

Later the same evening, appellant was confronted by Jesse and Toby Trevino who, having learned that Mario had been seen in the company of appellant, questioned appellant as to Mario's whereabouts. Appellant responded: "I haven't seen Mario," "I'm not taking the rap for nothing I didn't do, man," and "you know, the next time I go into jail, it's going to be for murder."

Early the next morning, March 3, 1985, Mario's body was discovered. While notifying the Trevinos of Mario's death, the authorities were informed of the threatening letters sent by appellant. Appellant was subsequently arrested and his home searched. The search produced a jacket and shoes which were still wet from having recently been washed.

After being informed of his constitutional rights, appellant therein provided police with both oral and written statements concerning the death of Mario. In both the oral and written statements, appellant admitted that he had confronted the boy at the beverage store, led him to the secluded location and then brutally beat the child, leaving Mario to die.

*State v. Morales*, 513 N.E.2d 267, 269-70 (Ohio 1987) (ellipses, brackets, and footnotes omitted); *see also Morales v. Coyle*, 98 F. Supp. 2d 849, 855-56 (N.D. Ohio 2000) (adopting the facts as set forth by the Ohio Supreme Court).

## B. Procedural History

Following his arrest,

Appellant was . . . indicted for kidnapping in violation of [Ohio Revised Code section ("R.C.")] 2905.01, aggravated murder with prior calculation and design in violation of R.C. 2903.02(A), and aggravated murder in violation of R.C. 2903.02(B) with the specification that the crime was committed while appellant was committing or attempting to commit the offense of kidnapping in violation of R.C. 2905.01. At his arraignment, appellant entered pleas of not guilty to all the offenses charged. These pleas were all subsequently changed to pleas of not guilty by reason of insanity.

*State v. Morales*, 513 N.E.2d at 270.

Morales's trial began on December 2, 1985. *Id.* During voir dire, the trial judge and counsel for both parties questioned a juror ("Juror B") regarding his ability to impose the death penalty in the event that the jury found Morales guilty of aggravated murder. At the conclusion of that voir dire, the state moved to exclude Juror B for cause based upon his "lack of basic understanding of what we're here about, and [because] he's also indicated that he could not join in a verdict where the death penalty is a possible sentence." J.A. at 828 (Trial Tr. at 704). The trial court granted the motion over the objection of defense counsel, stating, "It's obvious to the Court that he is unprepared to take on the challenge of this jury, and that he more than a dozen times said he could never accept the death penalty." J.A. at 828-29 (Trial Tr. at 704-05).

The guilt phase of Morales's trial lasted until December 18, 1985. *State v. Morales*, Nos. 57868, 57869, 1991 WL 8592, at *1 (Ohio Ct. App. Jan. 31, 1991). Morales's defense was premised upon the theory that "in no way on March 2, 1985, could Alfred Morales appreciate the

consequences of his acts or refrain from committing those acts, or understand the difference between right and wrong." J.A. at 832 (Trial Tr. at 1014 (defense opening statement)). In support of that theory, defense counsel presented the testimony of five witnesses who testified to Morales's consumption of alcohol on the day of the murder, three witnesses in the field of Native American affairs, and one expert witness in the field of psychology.

The first defense witness, Noel Camaigo ("Camaigo"), testified that, between 7:00 or 7:30 p.m. and 9:30 p.m. on the day of the murder, he saw Morales consume "almost two and one half fifths" of Wild Irish Rose wine and three or four forty-ounce bottles of malt liquor. Supp. J.A. at 1013-15 (Trial Tr. at 1394-96). Camaigo stated that "[w]hen I got there I see he be just starting to drink. So as time running along he started getting tipsy there and kept going back to the store. Here, I'd say he was drunk. When he left the house he was drunk." Supp. J.A. at 1015-16 (Trial Tr. at 1396-97). On cross-examination, however, Camaigo admitted that the wine and malt liquor were shared among six people. On redirect, Camaigo estimated that Morales drank "about a fifth and one half, almost two fifths" of wine and beer between 7:00 p.m. and 9:30 p.m. Supp. J.A. at 1041-42 (Trial Tr. at 1420-21).

Mary Ellen Tyler, at whose home Morales consumed the beer and wine, testified that, by the time he left, she could tell from his demeanor that he had been drinking. On cross-examination, she stated that, at the time he left, Morales had still been functioning well enough to speak coherently and to purchase something at a store. She further testified that, when Morales returned to her home at around 11:00 p.m. that night, he was not so drunk that he was unable to walk up and down steps.

Mary Ellen Tyler's brother-in-law, Richard Tyler, who lived in the same home as Mary Ellen Tyler and her husband, testified that he saw Morales consume a "good quantity," or "quite a bit," of alcohol at the Tyler home between approximately 6:00 p.m. and 8:00 p.m. on the evening of the murder. Supp. J.A. at 1065-66 (Trial Tr. at 1444-45). Richard Tyler stated, "It was—I—to the best of my recollection I suppose he had to have been intoxicated" by 8:00 p.m. that night. Supp. J.A. at 1066 (Trial Tr. at 1445). According to Richard Tyler, Morales "was still somewhat intoxicated" when he returned to the Tyler house about an hour later, "though not quite as much" as he had been when he left. Supp. J.A. at 1067 (Trial Tr. at 1446). During cross-examination, Richard Tyler conceded that Morales had no trouble walking, talking, or socializing either between 6:00 p.m. and 8:00 p.m. or when he returned to the Tyler home later that night. On redirect examination, Richard Tyler recalled that, when Morales returned at 11:00 p.m., "[t]here was slurred speech so there was some intoxication" on Morales's part, but "to what degree I can't say." Supp. J.A. at 1080 (Trial Tr. at 1459).

Mary Ellen Tyler's husband, Roderick Tyler, next testified, estimating that Morales had consumed a bottle of wine and a forty-ounce bottle of beer between 6:00 p.m. and 8:00 p.m. but "wasn't in too bad of shape." Supp. J.A. at 1083-84 (Trial Tr. at 1462-63). According to Roderick Tyler's testimony on cross-examination, Morales was still capable of walking, talking, and carrying on conversations when he left the Tyler house at 8:00 p.m. or 8:30 p.m. Roderick Tyler stated that Morales had returned at approximately midnight, climbed several flights of steps without falling, used the bathroom, and left without incident.

Defense counsel also presented the testimony of Morales's father, Richard Morales, who testified that Morales first came home drunk at the age of twelve and was frequently intoxicated from that time forward. Richard Morales stated, "[A] number of times I've battled him tooth and nail trying to stop him from drinking, and he wouldn't listen." J.A. at 850 (Trial Tr. at 1481). He further testified that:

I got him a job at American Greetings and he got paid one morning, 8:00, and 3:00 in the afternoon they brought him home barefooted. He didn't even know where he was at. And we put him to bed. And the next day he didn't even remember what happened. How he got home. This happened a number of times.

One time I found him on 47th on the corner there drinking, and he was passed out underneath the tree. And I was on my way to work and I brought him home and put him in the house, and put him to bed. I had a number of times when I talked to him and I tried to—

* * * *

Tried to get him counseling. I had an Indian counselor on 65th and Detroit to try to get him counseling. He didn't want to go there. I had him tested at BVR, because he didn't have no education and I work for the Indian Service here, Cleveland.

J.A. at 850-51 (Trial Tr. at 1481-82). According to Richard Morales, Morales was drunk three or four times a week between 1978 and 1985.

Morales's father also discussed Morales's prior criminal acts, all of which occurred while Morales was drunk:

Well, I'm a dialysis patient. I was laying on the bed because I had just come home from dialysis and he comes in. He was staggering in the kitchen. I got up to see what was the matter, and him and his mother were arguing. And he took some hamburger to cook it and he couldn't even hold it. He dropped it on the floor. Then he went to the bedroom and before I could even get in there I tried to stop him from going out and he went out by the door. He staggered in and he fell right off the stairway. He fell right—we have about five steps down and I couldn't catch him because I was pretty weak after treatment. He took off, and the next thing I know he got in trouble that night.

J.A. at 853 (Trial Tr. at 1484); *see also* J.A. at 854 (Trial Tr. at 1485) (stating that, when Morales stole a taxicab on a later date, "the understanding we had from the three guys he was with all were drunk").

Defense counsel then asked about Morales's condition on the night of the murder, and Richard testified as follows:

Yes. We went to the movie that day, that Saturday, and [Morales] and his mother and myself. Chuck Norris was the movie. We remember we come back and it was about 5:20. She was cooking supper and he went outside with the boy who lived upstairs, we call Jesus, then he took off. And that's the last time I seen him until approximately about maybe a quarter to 10 in that area.

He came home and he was—he walked in there and the first thing I notice he didn't have his big radio with him. Then he was staggering. And I was laying on the bed there in the living room and I said, "Son, what the heck are you drinking for? You told me you weren't going to drink after you got out of Mansfield [Reformatory]." I says, "Get a chair." And he says, "Dad, all I had was a couple." I said, "Don't give me that." I says, "I could smell wine and whiskey, whatever you're drinking. That's not beer. It smells terrible." I says, "Set down next to me here. I want to talk to you."

He set about from two or three feet away from me there and I says, "Son," I says, "what the heck are you drinking for?" I says, "You promised me at Mansfield you wouldn't drink anymore. Here you're out, I got you a job, you went to work and

here you are plastered." "Oh, Dad," he says. He says, "I feel dizzy. I think I'm going to go lay down."

So he went right across to the bedroom there, and I followed him in the bedroom there because I remember the time when he got up[,] that one felony[,] and left. I didn't want him to do that again as drunk as he was. So I went into the bedroom there and I talked to him.

I says, "Son, what's the matter? What makes you drink?" He says, "Dad, could you give me a break? We'll talk in the morning." And then he went to sleep.

J.A. at 854-55 (Trial Tr. at 1485-86).

Defense counsel subsequently called to the stand Hugh Clark Hosick ("Hosick"), the Executive Director of the North American Indian Cultural Center ("NAICC"); Milton Fletcher ("Fletcher"), a Program Coordinator for the NAICC; and Jerome Warcloud, Executive Director of the Cleveland American Indian Center ("CAIC"). Hosick, Fletcher, and Warcloud all testified that Native Americans are extremely susceptible to alcoholism. On cross-examination, both Hosick and Fletcher conceded that they had never personally counseled Morales, although Fletcher stated on redirect that other counselors at the NAICC had counseled Morales, and Warcloud said that Morales had "been associated with" the CAIC. Trial Tr. at 1518.

Finally, defense counsel presented the testimony of Rita Politzer, Ph.D. ("Politzer"), a forensic psychologist who interviewed Morales twice following his arrest; administered to Morales the Wechsler Adult Intelligence Scale test (the "Wechsler test"), the Bender Visual Motor Gestalt test (the "Bender test"), and the Rorschach Ink Blot test (the "Rorschach test"), and reviewed the results of another psychologist's administration of the Minnesota Multiphasic Personality Inventory (the "MMPI"); interviewed Richard Morales once; spoke once with Hosick; reviewed social, psychological, and vocational evaluations of Morales performed by various court personnel; and performed her own social history and psychological assessment of Morales. Politzer testified that Morales "came from a relatively intact family, but a very chaotic family situation," in which he lived for a time on a reservation, saw his parents separate temporarily when he was twelve years old, and was abused by his older brother. J.A. at 890 (Trial Tr. at 1526). "[H]e had a very, very difficult school history," moreover:

He had difficulty staying in school, going to school, passing grades. Staying motivated. And then following school when he dropped out finally. I found out that he had difficulty holding jobs because of intoxication and drug use. He would fail to get there on time. He'd fail to get there period. He'd be discharged. He'd get into arguments with people. Many, many difficult, traumatic situations.

*Id.*

Politzer also addressed Morales's extensive history of drug and alcohol abuse:

Mr. Morales started using alcohol [at] approximately the age of nine and then progressed to using more and more alcohol as the years progressed. Also using marijuana. Also hashish. He has smoked a variety of other substances and used a variety of pills, but the only thing he had not done is inject heroin. He did not like needles. That was one of the main things, he brought it out to me, that the only thing he did not do was . . . use heroin. And extensive use throughout the time to the point where he would black out[,] that he wouldn't remember where he was. That he would become violent when intoxicated and high on drugs.

J.A. at 891 (Trial Tr. at 1527).

She went on to detail his criminal history, as it related to his drug and alcohol abuse:

> [H]e had been involved in several different scrapes with the law, including felonious assault, including stealing a cab and other out of—disorderly conduct charges were also involved, and that were not listed in the reports that I had available to me, but that Mr. Morales told me about. And most of the time these offenses were involved when he was using alcohol or drugs, and he would get to the point where he really wasn't doing what he thought he should be doing. And he had served some time, of course, in Mansfield.

J.A. at 892 (Trial Tr. at 1528).

Politzer stated that Morales had a "high addictive potential" and a "history of unstable, unpredictable, impulsive, out-of-control, aggressive behaviors that are associated with personality disturbance from an early age." J.A. at 893 (Trial Tr. at 1529). Morales's Wechsler test results indicated "that there was a major discrepancy between his verbal processing skills and his psychomotor processing skills," "suggesting poor educational background, but no organic impairment," J.A. at 895-96 (Trial Tr. at 1531-32), and the Bender test confirmed the absence of an organic problem.

Politzer opined that Morales was not in control of his actions at the time of the murder: "My opinion was that Mr. Morales was unable to understand that his actions at the time were wrong, and he was because of the mental illness—and also that because of his mental illness [he] was unable to refrain from those actions at that time." J.A. at 898 (Trial Tr. at 1534). Politzer concluded that Morales "is an alcohol-dependent individual. He is a multiple drug-abusing individual and he also suffers from a borderline personality disorder." J.A. at 899 (Trial Tr. at 1535).

> Borderline personality disorder is a personality disorder in which the individual has a trait of an inability to control his actions. They tend to be impulsive individuals. He's unstable in a variety of areas of [his] life.
> He is an individual with a borderline personality disorder. Also has inappropriate intense anger or lack of control of anger, some questions about his identity as an individual, as a productive individual [in] society, and as an individual in general. They oftentimes will be unpredictable. They can also get involved in potentially self-damaging acts. They do things perhaps repetitively, not learning from experience[,] and almost put themselves in situations where they can be hurt. So in a sense it is a self-damaging situation.
> The instability, the intense unstable personal relationships, the emptiness, the feelings of alienation are the most common aspect of the borderline personality disorder.

J.A. at 899-900 (Trial Tr. at 1535-36).

On cross-examination, Politzer agreed that Morales was articulate, logical, and oriented to time, place, and person; that he had a fair "storehouse of information"; that his memory was intact; and that he was not delusional and had denied ever having experienced hallucinations. J.A. at 902 (Trial Tr. at 1538). She conceded that Morales was aware of his alcoholism but had never attempted to overcome it, and that his behavior was impulsive and violent. She affirmed that she had found no signs of a major thought disorder or organic brain impairment and agreed that voluntary intoxication is not a basis for an insanity defense.

When the prosecutor drew her attention to the coroner's finding that the victim had been struck with a sharp-edged object, Politzer opined that Morales's denial of having used such an object

indicated "[t]hat he was not aware of really what he was doing at the time, and I did not interpret it as lying." J.A. at 919 (Trial Tr. at 1555). She noted that Morales had told her that "he blacked out as far as recollection of what went on. Let me see it—exactly what words he used. He—'Everything happened so fast that I blacked out,' were his exact words." J.A. at 929 (Trial Tr. at 1565). Politzer conceded that her assessment was largely predicated on Morales's own account of the quantity of alcohol that he had consumed on the day of the murder, but noted that Morales's recent incarceration had probably lowered his alcohol tolerance:

> In my opinion it takes, given a biological breed disposition to become alcoholic or intoxicated, and given that Mr. Morales had had very little to drink in the month or so prior to his release from prison, it would take less to have him become intoxicated to a stup[o]rous blackout condition than it would somebody who is accustomed to drinking.

J.A. at 943 (Trial Tr. at 1579).

On redirect examination, Politzer stated that mental disorders other than psychosis can render an individual incapable of controlling his actions:

> We have a variety of different disorders that might—a personality disorder under certain circumstances, an [a]ffective disorder under certain circumstances, a dependent alcohol or drug-dependent disorder under certain circumstances may cause an individual to not know what he is doing is wrong or be able to refrain from doing it, yes.

J.A. at 951-52 (Trial Tr. at 1587-88). When asked whether such circumstances were present during the murder, such that Morales could not control himself, she answered in the affirmative, and described the circumstances as follows:

> My understanding was that he had consumed a considerable amount of alcohol, enough to lead to intoxication in a normal individual[,] let alone an alcohol-dependent individual. He had memory lapses at that time that suggest that he was passing in and out of awareness of really what was going on at the time. The alcohol as I assumed it combined with his personality disorder which leads to a lowering of impulses as a natural train in his personality and substantiated by years of examples of out-of-control behavior, unpredictable, out of control[,] emotionally labile,[1] violent actions. Aggressive actions even to himself.

J.A. at 952-53 (Trial Tr. at 1588-89).

In rebuttal, the prosecutor called to the stand Kathleen C. Dougherty, M.D. ("Dougherty"), a staff psychiatrist at the Court Psychiatric Clinic, who had examined Morales to determine his competency to stand trial and his sanity at the time of the murder. Dougherty testified that, after interviewing Morales and reviewing his social history, jail medical records, and the prosecutor's file, she had found him to be competent and to have been sane at the time of the act.

---

[1] The online version of the Oxford English Dictionary defines "labile" as "liable or prone to lapse," "apt to slip away; slippery," and, probably most relevant here, "prone to undergo displacement in position or change in nature, form, chemical composition, etc.; unstable." *Labile*, OXFORD ENGLISH DICTIONARY, http://dictionary.oed.com/cgi/entry/50128535?single=1&query_type=word&queryword=labile&first=1&max_to_show=10.

Q: During the course of that period of time that you had such conversations with [Morales] and thereafter did you make a finding as to whether or not there was any mental illness or defect apparent with respect to the Defendant?

A: Yes, I did.

Q: And what was that opinion based upon your examination, your specific educational background and your specific periods of employment as a psychiatrist in the past?

A: It was my opinion that he was suffering from no mental disease or defect at the time. That the only conditions evidenced in him were voluntary intoxication[,] self-induced.

Q: Did you further render an opinion as to his ability to refrain and/or as to his knowledge as to the wrongfulness of his act or acts?

A: Yes, I did. All no. I didn't feel that I needed to at that point since without any mental disease or defect somebody cannot be insane, but I went on to address the other issues in case there was a question about that.

Q: And in so addressing those other issues on the basis of your specific educational background, your training as a psychiatrist, your examination with respect to Mr. Morales in conjunction with all the other evidence available to you, did you have occasion to obtain and/or render an opinion as to his ability to refrain and/or his knowledge of the wrongfulness of his act?

A: Both.

Q: Can you tell us what your opinion was with respect to his ability to refrain?

A: It was my opinion that he had some impairment in his ability to refrain, which was due to his intoxication. But, that he had voluntarily assumed that impairment. He had caused that himself by becoming drunk.

Q: What is your opinion with respect to the wrongfulness of the act?

A: It is my opinion that he knew that the acts were wrong.

Q: How did you arrive at that opinion?

A: I went through with him what happened at the time of the instant offense. I reviewed with him whether or not he knew what he was doing. He knew that he was hitting Mario. He is a martial arts expert. Theoretically, he knew something about martial arts. He did not believe that he was doing anything other than hitting Mario. And he knew that the person that he was hitting was Mario, which indicated to me that he knew very well what he was doing. He indicated that he went back later and saw Mario. That he felt that he was having trouble breathing, and that he left him there.

Trial Tr. at 1599-1601.

During cross-examination, Dougherty stated that she was "aware that some American Indians have an enzyme deficiency and that there is a higher incidence of alcoholism in American

Indians than in the general population," but that she hadn't considered that fact in evaluating Morales's mental state at the time of the murder because she "didn't feel that was relevant." Trial Tr. at 1603-04. She further elaborated as follows:

> Q: Can we agree, Doctor, can we not, that an enzyme deficiency that exists in some American Indians reduces the ability of one to voluntarily intoxicate themselves, as it were?
>
> A: It reduces their tolerance for alcohol. It's very similar to an [A]ntabuse[2] effect. American Indians who have that particular deficiency cannot drink any large quantities of alcohol. Since Mr. Morales indicated he was able to consume large quantities he could not have suffered from that deficiency.

Trial Tr. at 1604.

In closing, defense counsel argued that Morales's intoxication on the night of the murder rendered him incapable of forming a specific intent to kill. The judge then instructed the jury that the insanity defense required Morales to establish by a preponderance of the evidence that, "at the time of the offense and as a result of mental illness or defect[,] he did not have the capacity either to know the wrongfulness of his conduct, or to conform his conduct to the requirements of the law." J.A. at 956 (Trial Tr. at 1682). The judge further stated that "[v]oluntary intoxication is not a defense to any crime." J.A. at 958 (Trial Tr. at 1684). The trial court denied, as supported by insufficient evidence, defense counsel's subsequent request that the instruction on voluntary intoxication be rescinded and replaced with an instruction that voluntary intoxication could mitigate specific intent. Trial Tr. at 1687-88.

The next day, the jury found Morales guilty of aggravated murder with a kidnapping specification, aggravated murder with prior calculation, and kidnapping. On the following day, with the consent of counsel for the parties, the same jury convened for the penalty phase of the trial. The only evidence presented by the defense during this phase was Morales's own unsworn statement, in which Morales apologized for his actions and said that he had started drinking alcohol at a young age because of his brother's violence toward him, his older sister's death, and his alienation from his peers. He explained that his aggressiveness was the result of his resolve "to be tough" and stand up for himself, J.A. at 961 (Trial Tr. at 1705), and stated that Jesse Trevino was the best friend he had ever had and that he hadn't hated Jesse or any other member of the Trevino family, even after the taxicab incident. Morales claimed to have suffered blackouts due to alcohol consumption throughout his life and to have noticed, after his last stint in the reformatory, that he was becoming intoxicated and violent after drinking only a little alcohol. He stated that the letters that he wrote to Toby Trevino while incarcerated at the reformatory were attempts to induce Toby to write back, "to see if he was still my friend." J.A. at 963 (Trial Tr. at 1707). Finally, Morales told the jury, "[i]t doesn't matter to me what happens because what I had did [sic] was real wrong . . . ." J.A. at 965-66 (Trial Tr. at 1709-10).

The jury returned a recommendation that Morales be sentenced to death on the count of aggravated murder with a kidnapping specification. The trial court subsequently adopted that

---

[2] "Antabuse is a medication taken several times a week and causes violent illness if alcohol is consumed." Ruth Shults, Nick Ellinger, Thomas Wyss, & Linda L. Chezem, *Alcohol-Impaired Drivers: Reducing the Risk for Children*, 33 J.L. MED. & ETHICS 49, 51 (2005).

recommendation and sentenced Morales to death.[3] The Ohio Court of Appeals and Ohio Supreme Court affirmed the convictions and sentences, and the United States Supreme Court denied Morales's petition for a writ of certiorari. The Ohio Supreme Court then granted a stay of execution to allow Morales to pursue state post-conviction relief, which was subsequently denied.

On December 9, 1996, Morales petitioned the district court for a writ of habeas corpus. The district court denied that petition on March 29, 2000. J.A. at 107-86 (Mar. 29, 2000 Dist. Ct. Mem. Op. & Order). Morales then filed a motion to alter or amend the district court's judgment, which motion was granted in part on May 15, 2000, on the ground that Petitioner's trial counsel rendered constitutionally ineffective assistance by failing to conduct an adequate investigation of potentially mitigating evidence. *Morales v. Coyle*, 98 F. Supp. 2d 849 (N.D. Ohio 2000). The district court declined to issue a certificate of appealability. *Id.* at 903.

The state filed a notice of appeal on May 25, 2000, challenging the grant of habeas relief. Morales cross-appealed on June 13, 2000, from the portion of the district court's order partially denying the habeas petition. We then remanded this case to the district court for reconsideration of the certificate of appealability. On remand, the district court certified two issues: whether Petitioner's trial counsel was ineffective in presenting Dr. Politzer's testimony during the guilt phase of the trial, and whether the trial court properly dismissed Juror B.[4] J.A. at 748-57 (Dec. 4, 2003 Dist. Ct. Order). On August 19, 2005, we declined to certify any additional claims.

## II. ANALYSIS

### A. Ineffective Assistance of Counsel

#### 1. Standard of Review

"We review *de novo* a district court's determinations concerning a habeas petitioner's ineffective assistance of counsel claim." *Higgins v. Renico*, 470 F.3d 624, 630 (6th Cir. 2006). Both the district court's and our own power to review the Ohio courts' resolution of that claim is, however, limited by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996) (codified in various sections of 28 U.S.C.):

> AEDPA prohibits a federal court from granting a writ of habeas corpus to a person in custody pursuant to a state court judgment with respect to a claim that was adjudicated on the merits in state court
> unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[3] The trial court also sentenced Morales to ten to twenty-five years of imprisonment on the kidnapping count and to life imprisonment on the count of aggravated murder with prior calculation and design. The Ohio Court of Appeals later merged the two aggravated-murder convictions, reversed the life sentence imposed for the second, and left standing the death sentence for the first.

[4] The district court rejected the latter claim. *Morales*, 98 F. Supp. 2d at 877-78.

*Moss v. Hofbauer*, 286 F.3d 851, 858 (6th Cir.) (quoting AEDPA, 28 U.S.C. § 2254(d)), *cert. denied*, 537 U.S. 1092 (2002).[5] While we apply AEDPA deference to the state courts' rulings concerning the merits of a claim, we review de novo issues not reached by the state courts. *Williams v. Anderson*, 460 F.3d 789, 804 (6th Cir. 2006); *Dickerson v. Bagley*, 453 F.3d 690, 698 (6th Cir. 2006).

### 2. Legal Standard

In analyzing Morales's claims of ineffective assistance of counsel, we undertake a two-part inquiry:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). In other words, Morales must show that his attorney's performance "fell below an objective standard of reasonableness," *id.* at 687-88, and that that performance was "prejudicial to the defense," *id.* at 692. Because Ohio law requires that the death penalty be imposed by unanimous vote, Morales may show prejudice by establishing "a reasonable probability that one juror would have voted against death had defense counsel presented [adequate] mitigation evidence." *Williams*, 460 F.3d at 804.

We are highly deferential in our review of counsel's performance, "judg[ing] the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. As the Supreme Court indicated in *Strickland*,

> A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Id.*

The right to the effective assistance of counsel applies to the investigation stage of a case. As the *Strickland* Court observed,

---

[5] "Because [Morales] filed his federal habeas corpus petition after the Antiterrorism and Effective Death Penalty Act (AEDPA) became effective, AEDPA's provisions apply to this case." *Moss*, 286 F.3d at 858.

strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690-91. These basic principles from *Strickland* guide our evaluation of Morales's ineffective-assistance claims.

### 3. The State's Challenge to the Finding of Ineffectiveness During the Penalty Phase

Morales claims that his counsel were ineffective in preparing for the penalty phase of his trial. The Ohio Court of Appeals rejected this claim, finding that trial counsel had made a permissible strategic decision to present mitigating evidence during the guilt, rather than the penalty, phase of the trial. J.A. at 503-05 (Journal Entry at A37-A39). The state appellate court did not expressly address Morales's argument that counsel failed to conduct an adequate investigation, which would have yielded significant additional evidence that could have been presented in mitigation. And, because the Ohio court found that counsel's performance was not deficient, it did not reach the prejudice step of the *Strickland* analysis. The district court disagreed with the state court and granted habeas relief on this claim, setting aside Morales's death sentence and instructing the state to conduct a new sentencing trial or impose a life sentence. *Morales*, 98 F. Supp. 2d at 904.

#### a. Deficient Performance

Because the state courts resolved the issue of deficient performance on its merits, we owe AEDPA deference to their conclusion. We agree with the district court, however, that that conclusion is an unreasonable application of clearly established constitutional law. In support of its conclusion that the performance of Morales's trial counsel was deficient, the district court cited counsel's failure to interview any member of Morales's family, any of his friends, or "anyone else who knew him"; to "search any records pertaining to [Morales's] education, health, mental problems, or juvenile offenses"; to retain any mitigation expert; "to adequately prepare [Morales] to make an unsworn statement in the penalty phase of the trial"; "to adequately investigate [Morales's] cultural background and the effect it had on [his] life"; and "to investigate the possibility of a neurological cause of [Morales's] mental and emotional deficiencies due to his lifelong alcohol consumption." *Morales*, 98 F. Supp. 2d at 898-99. The district court also noted that Morales's trial counsel did not request time between the guilt and penalty phases to conduct a mitigation investigation.

The district court agreed with Morales that "documentary evidence exists, which has been a part of the record," to support each of the points that Morales claims should have been, but were not, raised by trial counsel, namely:

- The chaotic and dysfunctional family environment in which the Petitioner was raised.
- The alcohol abuse by the Petitioner's mother and father.
- The effect that his mentally retarded brother had on his life.
- The effect that the suicide of his emotionally disturbed sister had on him.
- The effect of the Petitioner's mother's emotional problems on his development.
- The role of alcohol in the Native American Indian culture in which he was raised.

- The early (since age 9) and continued use of alcohol by the Petitioner.
- The Petitioner's drug abuse.
- The lack of parental supervision during his youth and adolescence.
- The prejudices the Petitioner experienced.
- The lack of counseling or programming received by the Petitioner while he was incarcerated in the Mansfield Correctional Facility.

*Id.* at 899-900. Accordingly, the district court determined that the state courts had unreasonably applied *Strickland* in concluding that trial counsel's performance was simply the result of an informed strategic or tactical decision, and thus in the state courts' view was not deficient. *Id.* at 899-901.

Morales's evidence establishes that his trial counsel conducted an inadequate investigation in preparation for the penalty phase. First, the record clearly demonstrates that defense counsel failed to interview key witnesses for both the prosecution and the defense. Richard Tyler, who testified in Morales's defense during the guilt phase of the trial, states that defense counsel never interviewed him before calling him to the stand. J.A. at 740 (Richard Tyler Aff. at 1 ¶¶ 4-5). Danny Thompson and Georgia Lee Thompson, both prosecution witnesses, similarly aver that defense counsel never contacted them prior to trial. J.A. at 741-42 (Thompsons Affs.).

Moreover, defense counsel did not hire a mitigation specialist or investigator and did not himself contact any of Morales's family members other than Morales's father, Richard, even though numerous other family members were willing to testify. In particular, Morales's mother avers that defense counsel never contacted her prior to or during Morales's trial, despite the fact that she attended the trial. If asked, she would have testified that both of her parents abused alcohol; that she herself used peyote during her first marriage; that her daughter, Morales's half-sister, "was an emotionally disturbed child who committed suicide when she was twenty years old"; that Morales's brother was born mentally disabled and that Morales had felt obligated to protect his brother during their childhood; that Morales's brother was subsequently committed to a psychiatric hospital at least three times for "explosive behavior"; that Morales's father abused alcohol and neglected the family during Morales's youth; that Morales's parents separated when he was young; that Morales had little discipline growing up and began drinking and using drugs as an adolescent; that she "now realize[s] how neglected [Morales] was while he was growing up"; and that she loves her son and does not want him to be executed. J.A. at 722-25 (Ella Morales Aff. at 1-4 ¶¶ 7-9).

Morales's aunt, Virginia Johnson, would, if contacted, have testified that both of her parents (Morales's maternal grandparents) were alcoholics; that Morales's maternal grandfather was murdered in jail after being arrested for drunkenness; that Morales's half-sister was emotionally disturbed and eventually committed suicide; that Morales's father, Richard, "would drink most of his money away" when Morales was a child; and that Morales's mother neglected Morales, devoting her attention instead to Morales's disabled brother. J.A. at 720-21 (Johnson Aff. at 1-2 ¶¶ 1-3).

Morales's uncle, Ron Morales, would, had he been contacted by Morales's attorney, have testified that Morales's father and all of his father's siblings drank heavily and that two of the siblings died of cirrhosis due to alcohol abuse; that Ron Morales himself began drinking at the age of fifteen and, for the next ten years, consumed between three and four bottles of wine per day, suffering "numerous blackouts" and getting "into trouble frequently because of my drinking," which tended to lead to violent fights with his friends; that Morales was a restless child "who would try almost anything"; that Morales's father's heavy drinking and his parents' separation frequently left Morales unsupervised and without discipline as a child; that Morales began drinking at an early age; and that Morales's drinking led to blackouts. J.A. at 732-33 (Ron Morales Aff. at 1-2 ¶¶ 2-3).

Morales's first cousin, Mike Morales, executed an affidavit to the effect that he would, if contacted, have testified that Morales frequently had to stand up for his "mentally retarded" brother as a child, a situation that "created much tension and stress" for Morales; that Morales was first given alcohol by older Native Americans when he was in the sixth or seventh grade; that those older Native Americans pressured young men in the community to drink alcohol and criticized as unmanly those who refused; and that Morales had a tendency to become violent and have blackouts when he drank. J.A. at 734-35 (Mike Morales Aff. at 1-2 ¶¶ 1, 4-5).

Morales's father avers that he set up two appointments for defense counsel to meet potential defense witnesses (including, presumably, the family members whose potential testimony is described above), but counsel cancelled both meetings at the last minute. J.A. at 727 (Richard Morales Aff. at 2 ¶ 8). Richard Morales further asserts that he met with Morales's attorney for only ten minutes before testifying (the only family member to do so) in Morales's defense during the guilt phase of the trial. J.A. at 727 (Richard Morales Aff. at 2 ¶¶ 10-11). Had he been contacted in connection with the mitigation phase, Richard Morales would have testified that two of his siblings, Morales's aunt and uncle, died of cirrhosis of the liver caused by alcohol abuse; that another of Morales's uncles has a history of "blacking out" when drinking; that Morales "was forced into the role of 'protector' for his older brother[, a] role he did not want," that that brother was once hospitalized after assaulting his and Morales's mother; that Morales was often left unsupervised as a child due to Richard Morales's heavy drinking; that Morales did not graduate from high school; that Morales had requested, but was denied, treatment for his alcoholism while he was incarcerated in the Mansfield Reformatory prior to the murder; and that he, Richard Morales, loves his son and does not want him to be executed. J.A. at 727-29 (Richard Morales Aff. at 2-4 ¶¶ 8-13).

Joseph Samson, the former principal of the high school that Morales attended (but from which he did not graduate), avers that he would have been willing to testify that Morales "was a victim of an inadequate home environment which lacked stability"; that Morales's school attendance was "very poor due to the fact that he felt like a social misfit"; and that, after Morales had dropped out of school, he "returned . . . to visit me" several times "to demonstrate to me how manly he had become." J.A. at 738-39 (Samson Aff. at 1-2 ¶¶ 1, 3-5). Morales "was drunk on both [of] these occasions and had to be escorted out of the building." J.A. at 739 (Samson Aff. at 2 ¶ 5(H)).

The available testimony that Morales's counsel failed to discover and, thus, to present was significant and was not cumulative of the evidence that the defense actually presented during the guilt and penalty phases of Morales's trial. Notably, defense counsel presented no sworn testimony and submitted no evidence *at all* during the penalty phase. In fact, counsel did not even make an opening statement, and his closing statement was a mere three pages long. J.A. at 967-70 (Trial Tr. at 1711-14).

The only evidence offered by the defense at the penalty hearing—Morales's own unsworn statement—did not include many of the salient details set forth above. Morales stated to the jury, for example, that he had a sister who died when he was nine years old, but he did not mention her emotional disturbance, that her death was a suicide, or the fact that she was responsible for his welfare. He spoke briefly of his brother's violence toward him, but he did not say that his brother was mentally retarded and had also been violent toward their mother and had been repeatedly hospitalized in a psychiatric institution for his dangerous behavior, nor did he discuss the onerous pressure that he had felt, as a child, to protect his brother from other children. He made no mention of his grandparents', aunts', and uncles' alcoholism, which caused at least two of their deaths, or of his father's and mother's drinking and neglect. He explained that he himself drank alcohol as a child "because of the fact that I couldn't deal with a lot of things," "wasn't able to accept a lot of things," and "was tired of people making fun of me, and . . . was tired of people treating me the way they did," but he failed to mention the pressure to drink exerted on Native American boys by older men in the community. J.A. at 960 (Trial Tr. at 1704).

It is true that not all of the undiscovered testimony reflects favorably on Morales. Morales's friends and family members admit that Morales was resistant to discipline as a child and repeatedly engaged in violent and criminal acts as a young adult, usually while intoxicated. J.A. at 707-10 (Ruffin Aff. at 13-16). But the jury already knew much of this information. *See* J.A. at 850 (Trial Tr. at 1481) (Richard Morales testimony) ("Then he was under the influence of alcohol then [as a teenager], and then I—a number of times I've battled him tooth and nail trying to stop him from drinking, and he wouldn't listen."), 852-54 (Trial Tr. at 1483-85) (Richard Morales testimony) (describing Morales's previous arrests and convictions), 866-68 (Trial Tr. at 1497-99) (Richard Morales testimony) (same), 903 (Trial Tr. at 1539) (Politzer testimony) (conceding that Morales's behavior is "impulsive" and "violent"), 909 (Trial Tr. at 1545) (Politzer testimony) (describing a disciplinary notice for fighting issued to Morales during his incarceration at Mansfield Reformatory).

The United States Supreme Court has held that defendants have "a right—indeed, a constitutionally protected right—to provide the jury with the mitigating evidence that their trial counsel either failed to discover or failed to offer." *Terry Williams v. Taylor*, 529 U.S. 362, 393 (2000). In *Terry Williams*, as here, defense counsel neglected to interview at least one witness and failed to present evidence of "mistreatment, abuse, and neglect during [the defendant's] early childhood, as well as testimony that he . . . had suffered repeated head injuries, and might have mental impairments organic in origin." *Id.* at 369-70.

Similarly, the defendant in *Wiggins v. Smith* was deprived of competent representation when his "counsel abandoned their investigation of [his] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. 510, 524 (2003). The *Wiggins* defense team obtained the defendant's pre-sentence investigation ("PSI") report and records kept by the Baltimore City Department of Social Services ("DSS") describing Wiggins's placements in foster care as a child. *Id.* at 523. Defense counsel also had Wiggins examined by a psychologist in preparation for trial. *Id.* The Supreme Court held that "[c]ounsel's decision not to expand their investigation beyond the PSI and the DSS records fell short of the professional standards that prevailed in Maryland in 1989," which required "the preparation of a social history report," and of the standards promulgated by the American Bar Association ("ABA"), "standards to which we long have referred as guides to determining what is reasonable." *Id.* at 524 (internal quotation marks omitted).

The Court held in *Wiggins* that "[t]he scope of their investigation was also unreasonable in light of what counsel actually discovered in the DSS records." *Id.* at 525.

> The records revealed several facts: Petitioner's mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food.

*Id.* According to the Court, "any reasonably competent attorney would have realized that pursuing these leads was necessary," especially as there was no evidence "that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless." *Id.*

The Supreme Court again reaffirmed counsel's duty to investigate under circumstances such as those of this case, in *Rompilla v. Beard*, 545 U.S. 374 (2005). In *Rompilla*, trial counsel failed to present significant mitigating evidence concerning Rompilla's traumatic childhood, mental illness, and alcoholism, relying instead at the penalty phase upon his family members' pleas for mercy. *Id.* at 390. The Court held that defense counsel had a duty to examine Rompilla's school records and juvenile and adult incarceration records and to look for "evidence of a history of

dependence on alcohol that might have extenuating significance," *id.* at 382, even though Rompilla was "uninterested in helping" with the preparation of a case in mitigation and his family, though cooperative, "didn't really feel as though they knew him all that well since he had spent the majority of his adult years and some of his childhood years in custody," *id.* at 381-82 (internal quotation marks omitted).

Our own precedents lend further support to the district court's finding that Morales's counsel was ineffective. *See Harries v. Bell*, 417 F.3d 631, 639-40 (6th Cir. 2005) (holding that counsel was ineffective for failing to pursue "viable leads regarding Harries's poor mental health and troubled family background"); *Hamblin v. Mitchell*, 354 F.3d 482, 490 (6th Cir. 2003) (holding that counsel was ineffective for failing to discover that "Hamblin grew up in extreme poverty and neglect, surrounded by family violence and instability, had a poor education and likely suffers from mental disability or disorder"), *cert. denied*, 543 U.S. 925 (2004); *Coleman v. Mitchell*, 268 F.3d 417, 450-51 (6th Cir. 2001) (holding that counsel was ineffective for failing to present evidence that the defendant was abused, neglected, and abandoned as a child, had twice been hospitalized for head injuries, and had dropped out of school in the ninth grade), *cert. denied*, 535 U.S. 1031 (2002). In sum, the social history report, records, and testimony proffered by Morales's habeas counsel demonstrate conclusively that Morales's trial attorney failed adequately to investigate and, thus, was unable to present to the jury compelling mitigating evidence that was readily available at the time of trial.

### b. Prejudice

As noted above, the Ohio courts did not reach the prejudice step of the *Strickland* inquiry, and thus we review the issue de novo. The district court determined that Morales was prejudiced by his counsel's deficient performance, *Morales*, 98 F. Supp. 2d at 901-02, and we agree.

As the district court observed, the available information that Morales's trial counsel failed to discover and present to the jury included "many specific details about his tumultuous life, continued and uncontrolled alcohol and drug abuse, dysfunctional family history, potential mental health problems, and detailed cultural background." *Id.* at 902. In light of the volume and compelling nature of this evidence, there is a reasonable probability[6] that effective counsel could have achieved a different outcome. *See Strickland*, 466 U.S. at 694; *compare Dickerson*, 453 F.3d at 698-99 (holding that a petitioner satisfied the prejudice requirement by showing that his trial counsel neglected to discover evidence that he was nearly mentally retarded, that his biological father denied their relationship, that his family called him "the moron," and that he grew up "surrounded by pimps, prostitutes and drug dealers" (internal quotation marks omitted)), *and Hamblin*, 354 F.3d at 489-93 (holding that a petitioner satisfied the prejudice requirement by showing that his trial counsel neglected to discover evidence that he "grew up in extreme poverty and neglect, surrounded by family violence and instability, had a poor education and likely suffers from mental disability or disorder"), *cert. denied*, 543 U.S. 925 (2004), *with Durr v. Mitchell*, 487 F.3d 423, 435-36 (6th Cir. 2007) (holding that a petitioner did not establish prejudice by presenting character evidence undiscovered by trial counsel that was simply cumulative of the evidence presented at trial), *and Foley v. Parker*, 488 F.3d 377, 382-83 (6th Cir. 2007) (concluding that the state courts' determination of no prejudice was not unreasonable where a petitioner presented no evidence of "a difficult childhood or mental problems that might have portrayed him in a more sympathetic light").

---

[6] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Because the net effect of the undiscovered and unpresented evidence, viewed cumulatively and in light of the totality of the circumstances, demonstrates the existence of significant mitigating evidence that favored Morales, it is reasonably probable that at least one juror hearing that evidence would have been persuaded to impose a life, rather than a death, sentence. Accordingly, the district court properly granted habeas relief on the ground of ineffective assistance of counsel at the penalty phase of Morales's trial.

### 4.  Morales's Claim of Ineffective Assistance During the Guilt Phase

Morales argues that defense counsel rendered ineffective assistance by presenting Politzer's testimony during the guilt phase of the trial despite knowing that Politzer did not believe that Morales had a viable voluntary-intoxication defense. Morales contends that Politzer harmed his case when, during cross-examination, she gave the following testimony:

Q:  All right. And during that period of time that you were so under the wing of Dr. Resnick as it were, do you agree with his position that voluntary intoxication does not serve as a basis for the insanity defense?

\* \* \* \*

A:  Yes, I generally agree with the position.

J.A. at 913-14 (Trial Tr. at 1549-50).

It is unclear whether Morales presented this precise issue to the state courts; the last reasoned state-court opinion on the issue—that of the Ohio Court of Appeals—characterized the argument as alleging ineffective *pretrial* assistance on the ground "that trial counsel would not have pursued the not guilty by reason of insanity defense had he conferred with his own expert, Dr. Rita Politzer." J.A. at 500 (Sep. 29, 1993 State Post-Conviction Op. at A34). In rejecting this contention, however, the Ohio appellate court also addressed the argument that Morales makes here, by holding that Politzer's testimony supported the insanity defense by setting forth her "clearly expressed . . . opinion that, due to a mental illness, appellant did not know that his conduct which resulted in the death of Mario Trevino was wrong." J.A. at 501 (Journal Entry at A35). The district court denied habeas relief on this ground, adopting the reasoning of the state court. *Morales*, 98 F. Supp. 2d at 868. On appeal, Morales argues that he has satisfied the *Strickland* standard with respect to this claim. The state contends that the claim is procedurally defaulted and, in any event, that the claim is not meritorious.

#### a.  Procedural Default

As a threshold matter, the state argues that we are precluded from considering Morales's guilt-phase IAC claim, because Morales procedurally defaulted that claim by failing to raise it on direct appeal from his conviction.[7] Morales responds by pointing out that the claim relies on evidence outside of the trial record, including Politzer's post-trial affidavit, which states that Politzer informed Morales's counsel before trial that she did not believe that Morales had a viable insanity defense, as well as the affidavits of neuropharmacologist Jonathan J. Lipman, Ph.D. ("Lipman") and forensic psychologist James R. Eisenberg, Ph.D. ("Eisenberg"), both of whom expressed the opinion that evidence available at the time of Morales's trial should have led Morales's defense team to have Morales tested for organic impairment and extreme susceptibility to alcohol. J.A. at 361-64 (Lipman Aff.), 654-65 (Eisenberg Aff.), 718-19 (Politzer Aff.). Morales further contends that, even if he did

---

[7]This is the only procedural-default argument raised by the state, which does not argue, on appeal, that Morales did not raise the argument in the state *post-conviction* proceedings.

default the claim, that default was excused by the Ohio appellate court, which addressed the claim on the merits.

In determining whether a claim is procedurally defaulted, we engage in a four-part inquiry, asking whether:

> (1) a state procedural rule exists that applies to the petitioner's claim, (2) the petitioner failed to comply with the rule, (3) the state court actually applied the state rule in rejecting the petitioner's claim, and (4) the state procedural rule is an adequate and independent ground upon which the state can rely to deny relief.

*Frazier v. Huffman*, 343 F.3d 780, 790 (6th Cir. 2003), *cert. denied*, 541 U.S. 1095 (2004). "Furthermore, a procedural default does not bar consideration of a federal claim on habeas corpus review unless the last state court rendering a reasoned opinion in the case clearly and expressly states that its judgment rests on a state procedural bar." *Id.* at 791 (internal quotation marks omitted).

Morales is correct on both counts. First, while the state points out that the trial record itself sufficed to demonstrate or disprove Morales's claim that Politzer's testimony actually harmed his case, the post-trial affidavits provide the only evidentiary support for Morales's contention that his counsel knew of Politzer's negative opinion of Morales's insanity defense and that other expert testimony or medical evidence might have been procured that would have proven more helpful to Morales at the guilt stage of his trial. Accordingly, Morales's guilt-phase IAC claim relies on evidence outside of the trial record and therefore was not defaulted when he failed to raise it on direct appeal. *White v. Mitchell*, 431 F.3d 517, 527 (6th Cir. 2005), *cert. denied*, 127 S. Ct. 278 (2006), *and* 127 S. Ct. 581 (2006). Moreover, the Ohio appellate court did address the claim on the merits and did not provide any procedural reason for denying it, thereby waiving any default that might have occurred. J.A. at 500-01 (Ct. App. Journal Entry re *Murnahan* application at 34-35). We therefore reach the merits of the claim.

### b. Morales's Claim

Morales contends that his defense counsel rendered ineffective assistance during the guilt phase by presenting the testimony of Politzer, which, he claims, undermined rather than supported the defense's theory that Morales was not guilty by reason of insanity because he was incapable of forming the intent to murder. In support of this theory, he cites our opinion in *Combs v. Coyle*, 205 F.3d 269 (6th Cir.), *cert. denied*, 531 U.S. 1035 (2000). In *Combs*, the defense's only expert witness testified on cross-examination, during the guilt phase of the trial, "that, although intoxicated, Combs acted purposefully and intentionally." *Id.* at 287. We held that defense counsel was objectively unreasonable (and thus ineffective) in presenting the witness without conducting a pretrial investigation adequate to reveal this damaging opinion, in light of the fact that involuntary intoxication is a defense, under Ohio law, *only* to the extent that it impairs the ability to form intent. *Id.* at 288.

This case is distinguishable from *Combs*, however, in several crucial respects. First, unlike Combs's counsel, Morales's trial attorney fully ascertained his expert witness's opinion before trial. J.A. at 718 (Politzer Aff. at 1 ¶ 3) ("When I talked to Mr. Damiani, I told him my findings were more suited to a diminished capacity defense rather than [a] not guilty by reason of insanity defense. . . . [I]n my opinion . . ., he would not be successful on a not guilty by reason of insanity defense."). Second, the bulk of Politzer's testimony was *helpful* to the defense. Unlike the expert in *Combs*, who undermined the defense in that case by testifying that the defendant was capable—despite his intoxication—of forming the requisite intent, Politzer testified that Morales's personality disorder,

combined with his alcohol dependency and abuse, deprived him of the ability to refrain from or understand the wrongfulness of his actions. J.A. at 898-99 (Trial Tr. at 1534-35).

Finally, although Politzer did concede, during cross-examination, that voluntary intoxication alone is not a basis for the insanity defense, J.A. at 913-14 (Trial Tr. at 1549-50), she also testified that voluntary intoxication was not the only contributing factor in the murder of Mario Trevino, J.A. at 951-53 (Trial Tr. at 1587-89). More to the point, Politzer was presented as a psychological, not a legal, expert, and thus her response to the question on cross-examination as to the legal efficacy of a voluntary-intoxication defense was neither relevant nor admissible. In fact, defense counsel objected to the question, but the trial court overruled that objection and allowed Politzer to answer. J.A. at 913-14 (Trial Tr. at 1549-50). Accordingly, because the substance of Politzer's testimony supported the defense theory, and because her one unhelpful comment was improperly admitted over defense counsel's objection, we decline to hold that trial counsel provided ineffective assistance in presenting Politzer's testimony.

Morales also argues that defense counsel rendered ineffective assistance by failing to conduct an adequate investigation of Morales's medical records, which would have revealed "clear indications of underlying problems including possible neurological impairment." Morales Br. at 41 (internal quotation marks omitted) (quoting J.A. at 659 (Eisenberg Aff. at 6)). According to Morales, a review of these records would have permitted Politzer to provide more helpful testimony. In support of this contention, he points to Politzer's testimony, on cross-examination, that psychological testing of Morales had revealed no signs of mental illness or organic brain impairment. Morales Br. at 40-41 (citing J.A. at 936 (Trial Tr. at 1572)).

It is true that medical records that were available but undiscovered at the time of Morales's trial indicated that he may have suffered from neurological deficits. When Morales was in kindergarten, his school psychologist determined that "he had an 'immature neurological system' which accounted for his behavior control problems." J.A. at 712 (Ruffin Aff. at 18). The psychologist prescribed Morales an unspecified medication for this condition but believed that Morales would outgrow the problem. J.A. at 712-13 (Ruffin Aff. at 18-19). Additional evidence indicated that Morales suffered two head injuries in 1983, only two years before the killing, and a possible drug overdose less than a month before Mario Trevino's murder. J.A. at 714 (Ruffin Aff. at 20).

Even assuming, however, that trial counsel was deficient in failing to review these records or to present them to Politzer, our precedents preclude a grant of relief on this ground, as Morales has not demonstrated that he was prejudiced by counsel's performance. We recently denied a claim nearly identical to Morales's on the ground that "[t]rial counsel cannot be deemed ineffective, since even at this late date, there is no medical *proof* of a mental condition." *Carter v. Mitchell*, 443 F.3d 517, 529 (6th Cir. 2006) (internal quotation marks, brackets, and ellipsis omitted), *cert. denied*, 127 S. Ct. 955 (2007); *see also Smith v. Mitchell*, 348 F.3d 177, 202 (6th Cir. 2003) ("Dr. Smith never states that Smith suffers from organic brain damage. The closest thing to organic brain damage in Dr. Smith's statement is that Smith was dependent on alcohol, marijuana, and cocaine, and that each of these chemicals affects the central nervous system."), *cert. denied*, 543 U.S. 841 (2004); *Martin v. Mitchell*, 280 F.3d 594, 613 (6th Cir.) ("Martin's initial brief completely fails to point to what mitigating evidence further action on the part of his counsel would have uncovered."), *cert. denied*, 537 U.S. 1004 (2002); *Campbell v. Coyle*, 260 F.3d 531, 555 (6th Cir. 2001) (denying a habeas claim of ineffective assistance because the petitioner had provided no evidence that he suffered from the claimed disorder), *cert. denied*, 535 U.S. 975 (2002).

Under these precedents, Morales's new evidence, which—at best—indicates that he *might* suffer from some unidentified and unproven organic brain dysfunction, is insufficient to demonstrate that his trial counsel's allegedly deficient performance prejudiced his case. Moreover, his

contention that access to the new evidence would have rendered Politzer's testimony "dramatically different," Morales Br. at 41, is at least an exaggeration of the truth. By testifying that Morales had been unable to comprehend the wrongfulness of his actions or to refrain from taking those actions on the night of the murder, Politzer provided evidence supporting the defense's central contention, and that evidence was not significantly undermined by her statement that she had not detected any evidence of organic disease. Accordingly, we hold that the district court did not err in denying habeas relief on this ground.

## B.  The Exclusion of Juror B[8]

Finally, Morales argues that the trial court erred in striking Juror B as not death-qualified[9] and as incompetent to serve on the jury. In denying Morales a writ of habeas corpus on this ground, the district court quoted the state appellate court's resolution of the claim:

> [Juror B's] failure to comprehend the business of the court would have provided a sufficient basis for excusing him. Furthermore, reading his responses in context, it is evident that [Juror B] clearly indicated to the court that he would not follow the instructions of the trial judge and would not consider fairly the imposition of a sentence of death in this case. Under the circumstances, the record does not demonstrate an abuse of discretion by the trial court by excusing [Juror B] for cause.

*Morales*, 98 F. Supp. 2d at 877 (internal quotation marks omitted). The district court then stated simply that "Morales fails to show that this Court may grant a writ with respect to this claim. He fails to show that he is entitled to a writ pursuant to § 2254(d)(1) or (d)(2)." *Id.* at 877-78.

In *Witherspoon v. Illinois*, 391 U.S. 510 (1968), the Supreme Court held that a juror may not be excluded for cause on grounds of opposition to the death penalty unless the juror expresses an inability or unwillingness to impose the penalty on the facts of the particular case:

> A man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror. But a jury from which all such men have been excluded cannot perform the task demanded of it. . . . Culled of all who harbor doubts about the wisdom of capital punishment—of all who would be reluctant to pronounce the extreme penalty—such a jury can speak only for a distinct and dwindling minority [who believe in the death penalty].

*Id.* at 519-20 (footnote omitted); *see also Gray v. Mississippi*, 481 U.S. 648, 657 (1987) ("In *Witherspoon*, this Court held that a capital defendant's right, under the Sixth and Fourteenth Amendments, to an impartial jury prohibited the exclusion of venire members simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." (internal quotation marks omitted)).

In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Supreme Court "clarif[ied]" *Witherspoon*, which, in its words,

---

[8] Contrary to the state's argument on appeal, this claim is not procedurally defaulted, as it was resolved on the merits by the state courts. *See* J.A. at 472-74 (Ohio Ct. App. Journal Entry, Sep. 29, 1993, at A5-A7).

[9] "A 'death-qualified' jury is one from which prospective jurors have been excluded for cause in light of their inability to set aside their views about the death penalty that would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and their oath." *Buchanan v. Kentucky*, 483 U.S. 402, 407 n.6 (1987) (internal quotation marks and brackets omitted).

reaffirm[ed] . . . the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. That standard is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.

*Id.* at 424 (internal quotation marks omitted). The *Witt* Court acknowledged the impossibility of making each juror's views on the death penalty "unmistakably clear" during voir dire. *Id.* at 424-25 (internal quotation marks omitted). Accordingly, the Court suggested that,

[d]espite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Id.* at 425-26.

The Supreme Court has recently characterized *Witherspoon*, *Witt*, and their progeny as "establish[ing] at least four principles of relevance" to the question of a juror's death-qualification. *Uttecht v. Brown*, 127 S. Ct. 2218, 2224 (2007).

First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.

*Id.* (internal citations omitted). As the Supreme Court observed, "[d]eference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." *Id.*

In this case, Morales contends that Juror B indicated his willingness to consider the death penalty by responding "I guess I could" when asked whether he could "give fair consideration to each and every penalty and its possible effect." J.A. at 826-27 (Trial Tr. at 702-03). Morales further insists that Juror B stated "without hesitation or ambiguity" that he understood the tasks that he would have to undertake as a juror. Morales Br. at 23-25. The *Uttecht* opinion, however, makes clear that isolated statements indicating an ability to impose the death penalty do not suffice to preclude the prosecution from striking for cause a juror whose responses, taken together, indicate a lack of such ability or a failure to comprehend the responsibilities of a juror.

The prosecution in *Uttecht* struck for cause a juror to whom the Court referred as "Juror Z." 127 S. Ct. at 2222. Juror Z initially indicated that he could impose the death penalty in "severe situations." *Id.* at 2226-27 (internal quotation marks omitted). When asked to give examples of such situations, he said that the death penalty would be appropriate if a defendant affirmatively wanted to die or would inevitably re-offend upon release. After being informed by defense counsel that the defendant would never, under any circumstances, be released from prison, Juror Z expressed uncertainty about his ability to impose a death sentence. Pressed by the prosecution, Juror Z continued to equivocate regarding his willingness to consider the death penalty in the circumstances

of the particular case before him, though he generally stated "that he could consider the death penalty or follow the law." *Id.* at 2227. The prosecution challenged Juror Z for cause, citing his confusion about the proper circumstances for the imposition of a death sentence. The defense volunteered that it had no objection, and the trial court excused Juror Z. The Ninth Circuit granted Brown's federal habeas petition, holding that the state courts had not found Juror Z to be substantially impaired and, further, that "the transcript unambiguously proved Juror Z was not substantially impaired." *Id.* at 2227-28. The Supreme Court reversed, holding that the record established that Juror Z "had both serious misunderstandings about his responsibility as a juror and an attitude toward capital punishment that could have prevented him from returning a death sentence under the facts of this case." *Id.* at 2226.

The similarities between *Uttecht* and the instant case are striking.[10] Juror B, like Juror Z in *Uttecht*, expressed uncertainty and ambivalence regarding the death penalty many times during his voir dire. J.A. at 811-28 (Trial Tr. at 687-704). Indeed, Juror B repeatedly stated that he was generally opposed to the death penalty. *Id.* Moreover, the few circumstances under which Juror B indicated that he might be able to impose the death penalty did not include the circumstances of the murder with which Morales was charged. *See* J.A. at 825-26 (Trial Tr. at 701-02) (indicating that Juror B could consider the death penalty in a case involving mass murder or torture).[11]

Furthermore, Juror B's answers to voir dire questions provided ample cause for the trial court's concern regarding his ability to comprehend the proceedings. When the prosecutor asked directly about Juror B's feelings regarding the death penalty, Juror B responded, "What penalty would I be thinking about?" J.A. at 820 (Trial Tr. at 696). The prosecutor then inquired whether Juror B's feelings in relation to the death penalty would prevent him from imposing it under any circumstances, a question that Juror B apparently interpreted as referring to his relatives, as he answered, "Not nothing to do with relations or anything. That's just the way I feel about it." J.A. at 821 (Trial Tr. at 697). Morales's counsel subsequently stated to Juror B that there are no wrong answers to voir dire questions and that "[t]he only answer that is wrong is the one that you don't give us." J.A. at 822 (Trial Tr. at 698). Juror B responded, "You mean the first one?" *Id.* Given Juror B's seeming inability to understand the questions being posed and the instructions given to him, and in light of the considerable deference owed to the trial court's judgment, we cannot conclude that the district court erred in denying habeas relief on the basis of the trial court's exclusion of Juror B for cause.

## III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's grant of a partial writ of habeas corpus based upon the ineffective assistance of counsel that Morales received at the penalty phase of his trial. Accordingly, we **REMAND** the case to the district court with instructions to issue a writ of habeas corpus vacating Morales's death sentence unless the State of Ohio conducts a new penalty proceeding within 180 days of remand.

---

[10] We note that, unlike the defense counsel in *Uttecht*, Morales's trial counsel objected to the exclusion of Juror B. We therefore rely upon *Uttecht* only to the extent that it illustrates the circumstances in which a juror's voir dire responses support a finding that the juror is not death-qualified.

[11] Juror B, like Juror Z in *Uttecht*, also indicated that he could impose the death penalty upon a defendant who wished to die. J.A. at 823 (Trial Tr. at 699).

———————————

**DISSENT**

———————————

SUHRHEINRICH, Circuit Judge, dissenting.  I respectfully dissent from the majority's opinion because Morales has not proven actual prejudice from his counsel's alleged defective performance, and therefore cannot establish ineffective assistance of counsel as a matter of law under *Strickland v. Washington,* 466 U.S. 668 (1984).  I would therefore reverse the district court's partial grant  of Morales's petition for a writ of habeas corpus.

This Court has held that "[t]he failure to present additional mitigating evidence that is 'merely cumulative' of that already presented does not" equate to prejudice. *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006).  Rather, "[i]n order to establish prejudice, the new evidence . . . must differ in a substantial way–in strength and subject matter–from the evidence actually presented at sentencing." *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005).  The "new" evidence as presented in post-conviction proceedings does not meet this standard.

### The "New" Evidence Is Not New

The majority suggests that certain "key" witnesses,[1] if presented during the penalty phase of trial,[2] would have testified to: (1) the history of alcohol abuse in Morales's family; (2) the poor emotional health and early death of Morales's maternal step-sister; (3) the fact that Morales's older brother was mentally disabled and exhibited behavioral problems, and that Morales had to protect him; (4) the separation of Morales's parents when Morales was young and lack of stability in Morales's home environment; (5) Morales's lack of discipline and drug and alcohol use at a young age; (6) Morales's violent nature while drinking; (7) Morales's failure to graduate from high school; (8) the denial of Morales's request for treatment for his alcoholism while incarcerated prior to the murder.  But testimony pertaining to each of these matters had in fact been presented.

*First*: According to the majority, Morales's mother, father, aunt, and uncle would have testified to the prevalence of alcoholism in Morales's immediate and extended family, including the fact that some members of his extended family even died of cirrhosis of the liver due to their alcohol abuse.  Although none of the defense witnesses testified directly about the extent of alcohol abuse among Morales's family members, there was testimony concerning the prevalence of alcoholism during Morales's upbringing and the heightened susceptibility of Native Americans to alcoholism. During the guilt phase, Morales's father testified that "drinking was pretty heavy all around us" on

———————————

[1] The majority does not explain with any degree of particularity how the absence of each individual's testimony amounts to prejudice.  In its discussion of deficient performance, the majority does discuss how specific witnesses would have testified if called at the penalty phase.  These witnesses are: Ella Morales, Morales's mother; Virginia Johnson, Morales's aunt; Ron Morales, Morales's uncle; Mike Morales, Morales's cousin; Richard Morales, Morales's father; and Joseph Samson, the former principle of Morales's high school.

[2] Counsel's performance is not constitutionally deficient simply because the bulk of mitigating evidence was presented during the guilt phase.  In *Bell v. Cone*, 535 U.S. 685, 699-700 (2002), the Supreme Court held that trial counsel's failure to present witnesses during the penalty phase, which began one day after the petitioner was convicted, was not constitutionally ineffective where counsel had presented several witnesses during the guilt phase who testified regarding mitigating circumstances in support of the capital defendant's plea of not guilty by reason of insanity.  The Court emphasized that "[b]ecause the defense's theory at the guilt phase was not guilty by reason of insanity, counsel was able to put before the jury extensive testimony about what he believed to be the most compelling mitigating evidence in the case," and that "counsel reasonably could have concluded that the substance of their testimony was still fresh to the jury." *Id*. at 699.  Thus, the question of prejudice here is whether the evidence presented during the guilt phase *and* the penalty phase, collectively presented the sentencing jury with a sufficient picture of Morales's mitigating circumstances.

the reservation. (J.A. 848). Furthermore, the majority opinion notes that three witnesses also testified for the defense regarding the susceptibility of Native Americans to alcoholism. (J.A. 874-76; 877-82; 883-84.) Hugh Hosick, the Executive Director of North American Indian Cultural Center testified that there "[s]eems to be a physical need, a desire for these people to continue drinking," and that "it's an accepted practice within the Native American community to do a lot of . . . consumption." (J.A. 1508.) Milton Fletcher, a Program Coordinator for the North American Indian Cultural Center, testified that "alcohol has an adverse effect . . . on American Indians," and that "they ha[ve] a predisposition for alcohol," "a genetic and biological difference than other races of people about how alcohol effects them different[ly]." (J.A. 1512.) Jerome Warcloud, the Executive Director of the Cleveland American Indian Center, testified that "Native American people are most acutely affected by alcoholism than any other race or ethnic group in the nation." (J.A. 884.) And the majority opinion acknowledges Dr. Politzer's testimony that Morales has a "biological breed disposition to become alcoholic or intoxicated." (J.A. 943.) Thus, even had Morales's mother, father, aunt, and uncle testified on this matter, their testimony would not have added substantially to the evidence the jury heard.

*Second*: The majority states that Morales's mother and aunt would have testified that Morales's half-sister was emotionally disturbed and eventually committed suicide when she was twenty-two years old. Although the jury did not hear this, the jury learned from Morales himself of how his sister's death affected him. During the penalty phase, Morales stated:

> I had a sister who died when I was nine years old, and my father and my mother told me not to cry. And I didn't cry. But I didn't understand why she died or anything. But, I hated my parents because they didn't–I felt that they didn't tell me the truth about what had really happened.

(J.A. 960.) Thus, it is difficult to see how the testimony of Morales's mother and aunt could have been more mitigating than what Morales told the jury in his own words.

*Third*: The majority states that Morales's mother, father, and cousin would have testified as to the mental disability of Morales's brother and Morales's obligation to protect him from his peers. Again, the jury learned from Morales himself that he had an older brother who was abusive towards him. In his unsworn statement, Morales stated that he had a brother "who used to beat me all the time, and I couldn't understand it," and that his older brother "put my hate into him so bad, and up to this day I still don't–I still don't understand why he is like he is." (J.A. 960.) In addition, Dr. Politzer testified that her social history of Morales indicated that Morales's "older brother was abusive towards him and frequently there would be difficulties between him and the older brother in the home." (J.A. 890.) And again, it is difficult to see how the proposed mitigating evidence could have been more powerful than Morales's own reflections.

*Fourth*: The majority states that the former principal of Morales's high school would have testified that Morales "was a victim of an inadequate home environment which lacked stability." However, evidence of the separation of Morales's parents during Morales's youth and the lack of stability in Morales's home environment was presented through the testimony of both Morales's father and Dr. Politzer, as well as Morales himself. During the guilt phase, Morales's father testified that he and Morales had moved from Cleveland, Ohio to Susanville, California, and then back to Cleveland. (J.A. 847-49.) He also testified that he and Morales's mother were separated for a time. (J.A. 849.) As the majority acknowledges, Dr. Politzer testified that Morales "came from a relatively intact family, but a very chaotic family situation." She also testified that Morales was twelve when his parents separated temporarily." The majority quotes extensively from Dr. Politzer's testimony in which she described Morales's difficulty with staying in school and his eventual dropping out. (J.A. 890.)

And Morales himself told the jury in his unsworn statement during the penalty phase that:

> I don't remember how young I was when I started drinking, but I know it was a young age, because of the fact that I couldn't deal with a lot of things. And growing up in the school and in the environment that I was in, I wasn't able to accept a lot of things. And I couldn't understand why I had started drinking, but because of the lack of understanding I began to drink because I was tired of people making fun of me, and I was tired of people treating me the way they did.

(J.A. 960.) He also described his unhappiness upon his return to Cleveland, stating that he was picked on, and that he did not have any friends until he met Jesse Trevino during the ninth grade. (J.A. 959-61.) The proposed testimony of the former principal of Morales's high school on this matter would have added little to what the jury already heard regarding the stability of Morales's family life.

*Fifth*: The majority claims that Morales's mother, father, aunt, and uncle would have testified as to Morales's neglect as a child, lack of discipline, and drug and alcohol use at a young age. However, as the majority itself notes in its description of the trial testimony, Morales's father testified that Morales first came home drunk at the age of twelve, and, from 1978 to 1985, Morales's father estimated that Morales was drunk three to four times a week. (J.A. 852.) In addition, he testified that "I've always had problems with him [drinking alcohol]. I never had a lot of liquor in my house. [Morales would] sneak away and drink it and come back with liquor on his breath, and I'd put him to bed when he was 13, 14 on up." He also testified that "as [Morales] got older from 18 on up he was–I'd go by the street and I'd catch him [drinking]." (J.A. 850.)

Furthermore, the majority opinion acknowledges testimony on this subject, as it quotes extensively from the trial transcript in which Dr. Politzer testified that Morales began consuming alcohol at the age of nine, with increasing consumption as he grew older, and also used marijuana, hashish, and a "variety of pills." (J.A. 891.) She also testified that Morales had difficulty staying in school, eventually dropping out, and that Morales had trouble keeping a job because of alcohol and drug abuse. And Morales stated to the jury that he began drinking at a young age. (J.A. 960.) Thus, by the majority's own account, the bulk of this evidence was presented to the jury, and the proposed witnesses's testimony would not have been new.

*Sixth*: The majority suggests that Morales was prejudiced because the jury did not hear from his cousin, Mike Morales, that Morales had a tendency to become violent and have blackouts when he drank. It is puzzling why the majority would consider this testimony mitigating. Still, evidence of this matter had been presented when Dr. Politzer testified on cross-examination by the State's counsel that Morales exhibited impulsive and violent behavior when drinking. (J.A. 903.) And Morales stated that:

> I was drinking then [while living in California], and up until the time that I had left for Cleveland–when I came to Cleveland, the one thing that I always wanted to be, and that was to be tough. Because I was tired of people picking on me, and I wanted to get to a point where–where if anybody touched me or hurt me again I would be able to fight instead of balling up and crying somewhere in a corner.

(J.A. 961.) The majority recounted Dr. Politzer's testimony in which she described how Morales committed various crimes, including felonious assault, while under the influence of alcohol or drugs. (J.A. 892.) And, as the majority itself noted, Dr. Politzer in her testimony described how Morales had a "history of unstable, unpredictable, impulsive, out-of-control, aggressive behaviors that are associated with personality disturbance from an early age." (J.A. 893.) Clearly, Morales's cousin's proposed testimony on this matter would not have been new to the jury.

*Seventh*: The majority faults Morales's counsel for not presenting the testimony of Morales's father and former high school principal, who would have testified that Morales did not graduate from high school and that Morales's school attendance was "very poor due to the fact that he felt like a social misfit." Contrary to the majority's assertion, the jury heard evidence regarding Morales's failure to graduate from high school, namely when Dr. Politzer testified that Morales had difficulty getting passing grades and staying motivated, and eventually dropped out of high school. (J.A. 890.) The proposed testimony of Morales's father and the former principal of Morales's high school on this matter would not have been new.

*Eighth*: The majority claims that Morales's father, if called during the penalty phase, would have testified that Morales had requested, but was denied, treatment for his alcoholism while he was incarcerated in the Mansfield Reformatory prior to the murder. During the guilt phase, however, Morales's father had already testified that he talked to a counselor at the Mansfield Correctional Institution, who informed Morales's father that Morales had applied for counseling, but was denied because "[t]here's no counseling for the inmates that go there." (J.A. 873.) Moreover, the jury also heard evidence that suggested Morales was *not interested* in being treated for his alcoholism. As the majority acknowledges, Morales's father testified that he had an Indian counselor try to get Morales counseling, but Morales "didn't want to go there." (J.A. 851.) He further testified an Indian counselor would:

> pick Morales up a number of times and take him to the [Alcoholics Anonymous] meetings, and pretty soon [Morales] told me . . . "Dad, I don't smoke," He says, "If I go over there with that cigarette smell it's killing me." I don't know if he used that if he didn't want to go or what. So then [the counselor] came back by a few more times to try to get him to go, but he said because of that he wouldn't go. I also had a friend who went there and we tried to get [Morales] to go and he wouldn't go.

(J.A. 856.) The proposed testimony of Morales's father on this matter would have opened the door to damaging information regarding Morales's lack of interest in receiving treatment.

In short, although the laundry list of purportedly missing items *appears* substantial at first glance, none of this information differed in strength or subject matter from that which was presented by Morales's counsel. Thus, its absence cannot, as a matter of law, establish prejudice under *Strickland*.

### The "New" Evidence Would Have Opened the Door to Prejudicial Information

There is another reason why the failure to introduce the post-conviction evidence was not prejudicial. Had Morales's counsel called the witnesses in question, the door would have been opened to information damaging to Morales. With the door opened, the State would have been permitted under both federal and state law to introduce evidence to rebut the mitigation testimony of the witnesses in question. The United States Supreme Court has explained that sentencing courts have long "exercise[d] a wide discretion in the sources and types of evidence used to assist [them] in determining the kind and extent of punishment to be imposed within limits fixed by law." *Williams v. New York*, 337 U.S. 241, 246 (1949). With this in mind, the Supreme Court has held that due process is not violated merely because a sentencing court considers a defendant's past criminal behavior that did not result in a conviction. *See United States v. Watts*, 519 U.S. 148, 157 (1997) (holding that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence"); *cf. Nichols v. United States*, 511 U.S. 738, 748 (1994) (holding that a sentencing court may consider the underlying conduct that gave rise to an uncounseled misdemeanor conviction, if proven by a preponderance of the evidence).

Under Ohio's statutory sentencing scheme, a capital defendant can introduce mitigating evidence pertaining to such factors as the history, character, and background of the offender. *See* OHIO REV. CODE ANN. § 2929.04(B) (1981) (stating that the jury is to weigh against the aggravating circumstances, inter alia, "the nature and circumstances of the offense, the history, character, and background of the offender"). The Supreme Court of Ohio has held that the State, at the penalty stage of a capital trial, may introduce and comment on "evidence rebutting the existence of any statutorily defined or other mitigating factors first asserted by the defendant." *State v. Gumm*, 653 N.E.2d 253, 263 (Ohio 1995); *see also id.* at 262 ("Once lawfully inserted into the sentencing considerations, admissible evidence is subject to fair comment by both parties."). So if, for example, a defendant introduces evidence of his history as mitigating evidence, the State could introduce rebuttal evidence as to this mitigating factor, and thus counter the proposition that the defendant's history is mitigating. *See State v. Raglin*, 699 N.E.2d 482, 490 (Ohio 1998) (following *Gumm* for the proposition that "[t]he prosecution was entitled to introduce relevant evidence rebutting the existence of any statutorily defined or other mitigating factor first asserted by the defense," and holding that "[t]he testimony of the state's rebuttal witnesses was . . . relevant to rebut mitigating evidence that had been offered by the defense that appellant was remorseful for the killing[ and] that he would help or benefit others while serving a term of life imprisonment").

Much of the damaging evidence that could have been introduced by the State is detailed in the social history report produced by Rick Ruffin, a mitigation specialist for the Ohio Public Defender Commission. Had the witnesses in question testified regarding Morales's history, character, or background, the jury would have learned that when Morales was growing up, he was disciplined by his father, but the discipline had little effect on Morales. According to Morales's cousin, "it was like [Morales] didn't learn how to not get spanked. He just didn't care if he got spanked. He would cry, then get mean–and take it out on others. He would bully them." (J.A. 707.) Morales also often stole money from his parents and SSI checks from his mentally retarded older brother to buy drugs and alcohol. (J.A. 709.) He stole bicycles and car radios. While intoxicated he threw bricks through windows, cut telephone wires, wrecked cars, punched trees, and got into many fights. (J.A. 709.) While Morales's father was hospitalized for kidney problems, Morales was arrested "for intoxication and weapons charges." (J.A. 709.) Morales and his cousin Mike drank in excess and lost the family truck because he was drunk; on another evening, Morales passed out in a hobo camp and could not drive home. (J.A. 709-710.) Morales continued to drink excessively after returning from Cleveland, and committed two assaults against women. (J.A. 710.) One incident involved Morales pushing Louise Vasquez down to the ground and ripping her blouse, and, according to Vasquez, Morales raped her. (J.A. 711.) Morales was incarcerated for a year because of this incident. (J.A. 710.) On another occasion, Morales slapped Yolanda Trevino. (J.A. 711.) According to Ricky Sanchez, a friend of Morales from Cleveland, nobody in the neighborhood trusted Morales because his behavior was so unpredictable. On one occasion Sanchez's group of friends had to pull Morales off an unconscious opponent because they were afraid he would kill him. (J.A. 711.) Sanchez stated that "[w]hen Joe started to fight," "it was hard to stop him." (J.A. 711.) With regard to his relationship with the Trevinos, on one occasion Morales cut the Trevino family's telephone line; on another, he threw a brick through the their window; and on yet another occasion, Morales chased Toby Trevino with a knife. (J.A. 711.)

Had Morales's counsel put Morales's history, background, or character at issue, these instances of Morales's prior bad acts–which include many instances of violence and cruelty, and an allegation of rape–could have been introduced by the State. And this information, once heard by the jury, could only reinforce Morales's violent nature in the eyes of the jurors. This Court has commented that "it is far from true that bad testimony beats no testimony at all. Something . . . is not always better than nothing given the risk that every positive argument by a defendant potentially opens the door to a more-harmful response." *Tinsley v. Million*, 399 F.3d 796, 809-10 (6th Cir. 2005) (internal citations and quotations omitted). That the presentation of the post-conviction

evidence would likely cause Morales more harm than good should militate against a finding of prejudice.**3**

This Court's precedents are consistent with this conclusion. In *Carter v. Mitchell*, 443 F.3d 517, 533 (6th Cir. 2006), this Court concluded that a capital petitioner was not prejudiced from his counsel's failure during the penalty phase to present the testimony of certain family members in order to portray the petitioner's troubled background, "including his experiences with drugs and alcohol at an early age, his history of violent behavior, his experience with racial prejudice, and the influence of his alcoholic, philandering father." *Id*. at 530. The *Carter* court found that any non-cumulative testimony from the petitioner's family members would not have been mitigating, noting that their affidavits "describe a relatively stable, although imperfect, family environment," with "no allegations of physical or sexual abuse of [the petitioner]." *Id*. at 531. As another reason for declining to find prejudice, the Court stated that "had the family members' testimony been admitted, the prosecutor would have been free to extract testimony of [the petitioner's] criminal history, his history of drug use and alcohol abuse, and his notoriously quick temper and violent character." *Id*. The *Carter* court concluded that "[g]iven the lack of mitigating evidence available in this case and the likelihood that the testimony of [the petitioner's] family members would have done more harm than good, [not calling the petitioner's family members] was a sound decision." *Id.* at 532.

Importantly, the *Carter* court noted that "the Supreme Court has found more limited investigations into a defendant's background justified where any evidence presented would have a 'double edge.'" *Id*. at 532 (citing *Wiggins v. Smith*, 539 U.S. 510, 535 (2003); *Burger v. Kemp*, 483 U.S. 776 (1987); *Darden v. Wainwright*, 477 U.S. 168 (1986)). *Carter* also noted that this Court has declined to find deficient performance in a defense counsel's "strategic decision to limit testimony about [the defendant]'s past in order to prevent 'opening-the-door' to evidence of [the defendant]'s criminal background[.]" *Carter*, 443 F.3d at 532 (quoting *Clark v. Mitchell*, 425 F.3d 270, 286 n. 6 (6th Cir. 2005)).

Also instructive is *Moore v. Parker*, 425 F.3d 250, 254-55 (6th Cir.2005). In *Moore*, this Circuit again failed to find prejudice regarding a capital petitioner's claim of penalty-phase ineffective assistance of counsel. The *Moore* petitioner, like Morales, claimed that his counsel should have presented, for purposes of mitigation, additional testimony concerning the petitioner's "various problems that began to emerge during childhood, including impulsiveness, poor judgment, behavior control, anger, and harmful emotional attachment to others." *Moore*, 425 F.3d at 254. One potential witness included a psychologist who would have testified to "the severe neglect and physical abuse that [the petitioner] endured, nearly forty moves to foster homes and institutions, an alcoholic mother and abusive father," and that "[the petitioner] and his siblings were left home alone for extended periods of time, and relatives observed the children eating dog food and asbestos because there was no food in the house." *Id*. at 266 (Martin, J., dissenting). According to the court, much of the evidence described by the new evidence was presented at sentencing, and the evidence

---

**3** In fact, it would have been a valid trial strategy–not deficient performance–for Morales's trial counsel to decline to present Morales's post-conviction evidence had he known of its existence. *See Burger v. Kemp*, 483 U.S. 776, 792 (1987) (holding that counsel's decision not to present character witnesses during the penalty phase was not deficient performance because prior convictions might have been introduced on cross-examination); *Tinsley*, 399 F.3d at 808 ("At first blush, one might fairly question a penalty-phase strategy of [failing to introduce any mitigating evidence]. But, in this instance, there was more method of [counsel's] strategy than initially meets the eye. [The petitioner's counsel] (to say nothing of [the petition]) was not in an enviable position after the jury returned its finding of guilt. The murder was a brutal one."); *id*. at 809 ("Had [the petitioner's counsel] tried to introduce evidence of [the petitioner's] good character, his proclivity toward non-violence and his model prisoner conduct, the evidence likely would have opened the door to cross-examination on the conviction."); *Shears v. Caruso*, No. 2:06-1109, 2007 WL 1582151, at *3 (E.D. Mich. May 31, 2007) ("Counsel's decision to forego presenting character testimony, so as to avoid opening the door to potentially damaging information about petitioner, is a valid trial strategy that defeats petitioner's claim.").

"cast [the petitioner] as an easily angered, impulsive, out-of-control emotional leech with poor judgment." *Moore*, 425 F.3d at 254. The *Moore* court concluded that "introducing more evidence of this background, as [the petitioner] desired, would likely have made him look even worse to the jury. Thus counsel's failure to seek or present more background evidence was not even deficient performance, let alone prejudicial." *Id*.

In *Foley v. Parker*, 488 F.3d 377, 382 (6th Cir. 2007), which the majority mistakenly cites as distinguishable, the capital petitioner alleged that his counsel was ineffective during the penalty phase for failing "to fully investigate his background" and failing to "produce any mitigating evidence during the penalty phase of his trial." The *Foley* petitioner contended that various individuals, namely "six family members, five friends, and a school teacher who had not seen him since the 1970s," should have been called to testify on his behalf as mitigation witnesses. *Id*. at 382-83. The Court acknowledged that some of their testimony could be considered mitigating, in that the petitioner was described as "nice, giving, loving, sweet, a good family man, and a hard worker." *Id*. at 383. However, the Court held that the petitioner did not establish prejudice given that much of the post-conviction evidence "was either not mitigating or distinctly negative," specifically the evidence that "[s]everal witnesses mentioned [the petitioner's] penchant for violence, a description difficult to reconcile with the positive accounts but consistent with the crimes the jury knew [the petitioner] had committed." *Id*. at 383.

In *Durr v. Mitchell*, 487 F.3d 423, 436 (6th Cir. 2007), which the majority also mistakenly cites as distinguishable, the capital petitioner alleged that his counsel was ineffective during the penalty phase for failing to interview and present additional testimony from an ex-girlfriend, his step-father, and two siblings, who would have testified that the petitioner "grew up in a relatively stable home where rules were enforced, and basic needs were met." The *Durr* court held that the petitioner failed to establish prejudice because: (1) the post-conviction evidence was cumulative of that already presented; and (2) had the petitioner's former girlfriend testified, "the prosecution could have introduced rebuttal evidence concerning [the petitioner's] treatment of other women, including [the petitioner's] rape convictions. *Id*. at 436 (citing *Raglin*, 699 N.E.2d at 490).

Thus, as in *Carter*, *Moore*, *Foley*, and *Durr*, the defense counsel's failure to present allegedly new mitigation evidence cannot possibly be deemed prejudicial. As in these cases, the additional testimony would have made Morales look like a violent and out-of-control drunk who presents a danger to society.

### The Majority Misapplies this Circuit's Caselaw to Find Prejudice

The caselaw relied on by the majority to establish prejudice is distinguishable. In *Dickerson v. Bagley*, 453 F.3d 690, 698-99 (6th Cir. 2006), this Court found prejudice under *Strickland* because counsel failed to discover and present evidence that: (1) the capital petitioner's IQ placed him in a category slightly higher than mentally retarded; and (2) that the petitioner "was raised in a home where his biological father denied his relationship, where he was called 'the moron,' and was surrounded by 'pimps, prostitutes and drug dealers[.]'" *Id*. However, unlike the petitioner's counsel in *Dickerson*, Morales's counsel in this case presented testimony through Dr. Politzer regarding Morales's level of mental functioning, including his IQ, which was in the low, but still average, range (J.A. 895-96). She also testified as to Morales's family situation, which, while imperfect, was still "relatively intact." (J.A. 890.) And there is no evidence that Morales was ever physically, sexually, or psychologically abused like the *Dickerson* petitioner.

*Hamblin v. Mitchell*, 354 F.3d 482, 489-93 (6th Cir. 2003) also is not analogous. In *Hamblin*, we held that the capital petitioner was prejudiced by his counsel's failure to present evidence regarding his mental history and abusive childhood. *Id*. at 493. *Hamblin* is unique in that the petitioner's counsel "did not present the jury with *any* mitigating evidence." *Id*. at 490

(emphasis added); *see also Wiggins v. Smith*, 539 U.S. 510 (2003) (finding prejudice where the only mitigating evidence heard by the jury was that the petitioner had no prior convictions; petitioner's counsel presented no evidence of the petitioner's life history); *Frazier v. Huffman*, 343 F.3d 780 (6th Cir.2003) (finding prejudice where counsel presented no mitigating evidence except defendant's one-sentence plea of mercy). That is not the case here. In fact, the majority opinion details much of that mitigating evidence.

Moreover, the alleged mitigating evidence does not approach the extreme circumstances concerning the backgrounds of the petitioners in those cases. The Supreme Court and this Circuit have found prejudice when the jury was deprived of non-cumulative mitigating evidence such as severe physical, psychological, or sexual abuse, a violent upbringing, or abject poverty. *See, e.g., Rompilla v. Beard*, 545 U.S. 374, 392 (2005) (finding prejudice where petitioner was reared in abject poverty and suffered extreme physical and psychological abuse, which including being locked "in a small wire mesh dog pen that was filthy and excrement filled"); *Wiggins*, 539 U.S. at 534-35 (2003) (finding prejudice where petitioner suffered severe physical and sexual abuse including "physical torment, sexual molestation, and repeated rape" during his years spent in foster care); *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (finding prejudice where the petitioner had a "nightmarish" childhood, including that the petitioner's parents were imprisoned for their criminal neglect of their children, and that the petitioner was "severely and repeatedly beaten by his father"); *Harries v. Bell*, 417 F.3d 631, 639 (6th Cir. 2005) (finding prejudice where petitioner suffered from significant physical abuse during his childhood, including an incident in which he was hit on the head with a frying pan, and another in which "choked so severely that his eyes hemorrhaged"); *Hamblin v. Mitchell*, 354 F.3d 482, 490 (6th Cir. 2003) (finding prejudice where petitioner was reared in abject poverty, suffered from significant physical abuse, and suffered from a mental disorder which possibly resulted "from a severe blow to the head at about age [eight], inflicted by his father with a dog chain, and from a severe infection his mother suffered while pregnant with him, the result of a stabbing inflicted on her by [the petitioner's] father"); *Coleman v. Mitchell*, 268 F.3d 417, 452 (6th Cir. 2001) (finding prejudice where petitioner's childhood was "filled with abuse and privation," and petitioner exhibited "organic brain dysfunction" and was "borderline mentally retarded"). While Morales did not have a particularly amiable childhood, the circumstances of his upbringing contrasts markedly from these cases in which prejudice was established. Notably, Dr. Politzer testified that Morales "came from a *relatively intact family*, but a very chaotic family situation." (J.A. 890.) Although *cumulative evidence* establishes that Morales was abused by his older brother, the record is devoid of any evidence that rises to the levels of abuse described in the aforementioned cases.

### The "New" Evidence Does Not Alter the Balance Struck By The Jury

To find prejudice, there must be "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695. There is no reasonable probability that the jury would have found other than it did. As defense counsel pointed out in its opening statement, the facts "painted a masterpiece of horror," in which Morales:

> plotted, planned and lured a young boy to his certain death. Upon reaching a secluded location, appellant coldly and cruelly began beating the boy to death. During the course of this "execution," [Morales] knocked the boy down a hill, pulled the boy up again, and once again began systematically beating the life from his victim. The ultimate example of the savagery and sadistic nature of appellant's conduct is revealed in one incident where the appellant was holding his victim in a headlock, grabbed the victim by the hair and physically tore a large section of hair and scalp from the victim's skull-the boy was, in effect, scalped.

*State v. Morales*, 513 N.E.2d 267, 276 (Ohio 1987). The jury was confronted with the fact that Morales was 220 pounds and an expert in the martial arts; the victim was 92 pounds and twelve years old. Further, they heard that Morales had been considering murder as revenge for weeks before he executed it. Although his alcoholism was purported to be a mitigating factor, he was not so drunk on the night of the murder that he was unable to lead the young boy to a secret location one and a half miles away before the beating began. After he finished beating Mario, Morales was careful to wash the victim's blood from his knuckles, ice his hands, and wash his shoes and jacket. And on top of all this, *Morales confessed to the murder*–both orally and in writing.

Given these facts, I agree with the Supreme Court of Ohio's observation that "[t]he nature and circumstances of this offense are so horrendous that it would be difficult to imagine factors that might be mitigating." *Morales*, 513 N.E.2d at 277. Despite defense counsel's valiant effort to cast Morales in a tragic light, nothing in his upbringing explains the savage and sadistic nature of the murder here. As discussed, the majority fails to point to any evidence that differs in strength and subject matter to that which the jury heard and weighed against the aggravating factors in this case. For these reasons, I believe the majority erred in substituting its judgment for that of the jury's.